UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,

    -against-

AARON COMMEY,

       Defendant.

-------------------------------X

<u>MEMORANDUM AND ORDER</u>

Criminal Action No.
CR-00-1037 (DGT)

Trager, J:

    Defendant Aaron Commey was charged with, <u>inter alia</u>, attempting to hijack a National Airlines passenger jet in 2000. After a September 23, 2003, bench trial, Commey was found not guilty by reason of insanity of all charges and committed to the custody of the Attorney General. The Attorney General assigned Commey to a medical center run by the Bureau of Prisons ("BOP") for treatment. Moving <u>pro se</u>, Commey makes three related motions. Commey principally seeks his release from civil commitment under 18 U.S.C. § 4243(f). In addition, Commey moves to vacate the order of commitment, to exclude expert testimony and evidence and to find the expert witness in contempt. For the reasons set forth below, Commey's motions are denied.

## Background

### (1)

### Factual Background

Commey was charged in an indictment with attempted aircraft piracy, carrying concealed dangerous weapons on board an aircraft, violence at international airports, using a firearm while committing aircraft piracy and violating airport and aircraft security requirements.

The charges stemmed from an attempted hijacking at John F. Kennedy International Airport ("JFK") in 2000. On the night of July 27, 2000, Commey entered Terminal Four at JFK with a concealed handgun. Compl. ¶ 3. As he approached the security checkpoint, Commey brandished the gun, ordered airport security personnel aside and bypassed the metal detectors. Id. Commey then boarded a National Airlines flight headed for Los Angeles and entered the cockpit, taking the pilot and co-pilot hostage. Id. ¶¶ 2, 5. While the passengers and crew escaped, Commey told the pilot to fly south. Id. ¶ 5.

The airplane never left. The Port Authority Police and the FBI were able to establish contact with Commey in the cockpit. Id. ¶ 6. During negotiations, Commey demanded to be flown, variously, to Miami, Buenos Aires and Antarctica, but, shortly after midnight, he released the pilot and co-pilot. Id. ¶¶ 6-7.

At approximately 3:38 a.m., Commey surrendered to the authorities.  Id. ¶ 8.

Several forensic evaluations were conducted regarding Commey's competency to stand trial and his sanity at the time of the hijacking.  E.g., Gov't's Ex. 2 at 3.  During these evaluations, Commey reported that he planned to hijack the airplane and parachute into Antarctica in order to destroy the secret base of an organization called the "Cabal."  E.g., id. According to Commey, the Cabal was a secret group with designs to "'take over the world through mass destruction.'"  E.g., id. Commey had made an earlier attempt to destroy what he thought was the Cabal's secret base.  In 1998, he traveled to Buenos Aires with two firearms intending to continue from there to Antarctica, but was detained at the airport in Buenos Aires on suspicion of weapons smuggling.  E.g., id. at 3.  Commey was held in custody in Argentina for one month, where he underwent a psychiatric evaluation that resulted in the opinion that he exhibited symptoms of "delirious syndrome."[1]  E.g., id. Upon his return to the United States, Commey resumed his job at a chemical packaging plant in Wisconsin and abandoned his plan to destroy the Cabal's base.  E.g., id. at 2-3.  But, sometime

_____

[1] There is no reference in the DSM-IV to "delirious syndrome." The problem of nomenclature may be due to the translation from Spanish.  In any event, there was no testimony at hearing on the definition of this term.

after, Commey found a note with coded names, which he took as a sign that he should again try to reach Antarctica. E.g., id. at 3. He then formed the plan which culminated in the attempted hijacking at JFK. E.g., id. As a result of the evaluations, Commey was diagnosed, at different times in 2000, with delusional disorder, persecutory type, and with schizophrenia, paranoid type, and the opinion was formed that Commey was not criminally responsible for his crimes. E.g., id. Commey was found not guilty by reason of insanity and, based on psychological and psychiatric evaluations, was committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4243(e).

## (2)

### Confinement and Treatment in BOP Custody

Commey was assigned to Federal Medical Center ("FMC") Butner in Butner, North Carolina. In August 2004, he was transferred to FMC Devens ("Devens") in Ayer, Massachusetts, a medical treatment facility run by the BOP where he is currently committed.

Commey's day-to-day contact at Devens is with a treatment team consisting of psychiatrists, psychologists and social workers who provide direct care to Commey. In addition, he attends group and individual therapy sessions.

Once a year, a Risk Assessment Panel ("Panel"), consisting
of psychologists and/or psychiatrists who are not part of the
treatment team, convenes to evaluate the risk of releasing
Commey.  See Hr'g Tr. 17:16-20.  Panel members review the record
and discuss the data contained in it with each other and with
the treatment team.  Id. at 16:11-18, 17:14-15.  The Panel then
interviews the patient and "votes on the issue of continued
commitment or a recommendation for conditional release."  Id. at
16-17.  The Panel reduces its findings and recommendations to a
Risk Assessment Panel Report ("Panel Report" or "Report").  The
initial report (the "2004 Report"), completed on December 14,
2004, reflected the Panel's recommendation that Commey continue
his confinement at Devens to give Devens staff more time to
evaluate him.  Gov't's Ex. 7.  The Panel Report issued on
September 6, 2005, (the "2005 Report") reflected the Panel's
conclusion that Commey was suitable for conditional release.
Gov't's Ex. 6.  The 2005 Report was prepared by Dr. Dennis
Becotte, who was also the Chief Psychologist at Devens and the
chairperson of the 2005 Panel.  The 2006 Panel reversed the
previous Panel's decision, as reflected in the Panel Report
issued on July 19, 2006 (the "2006 Report").  Gov't's Ex. 5.
The Panel Reports issued on January 17, 2007, January 11, 2008,
and January 23, 2009, (the "2007 Report," "2008 Report" and
"2009 Report," respectively) were in agreement with the

recommendation reflected in the 2006 Report.  Gov't's Exs. 2-4.

The 2007 through 2009 Panels were chaired by Dr. Shawn Channell.

The conclusions of the various Panel Reports are set forth in

more detail below.

**(3)**

**Procedural History**

**a. Motions for Hearing**

On August 25, 2006, Commey, through counsel, moved for a

hearing for discharge from custody pursuant to 18 U.S.C.

§ 4247(h).  Commey based this motion on the 2005 Report, the

cover letter to which stated:

> It is the opinion of clinical staff that Mr.
> Commey has recovered from his mental illness
> to the point that with proper follow-up
> treatment and supervision, he would no
> longer be a danger to the person or property
> of others. Social work staff have begun work
> on a Conditional Release plan to the
> community. When these plans are in place,
> the Court will be contacted to consider the
> proposal. Until such time, Mr. Commey still
> meets criteria for commitment under Title 18
> U.S.C. Section 4243.

Gov't's Ex. 6 at 1.  Commey filed this motion a little over a

month after the issuance of the 2006 Report, which reversed the

2005 Report's recommendation for release.

A status conference on the motion scheduled for November

16, 2007, was moved to December 14, but, on that date, the

parties did not attend and the government failed to produce
Commey.  A status conference was held on March 7, 2008, at which
the government was directed to prepare an updated report on
Commey's mental health, and, on March 20, the government filed
its response to Commey's August 26, 2006, motion opposing his
release.

At a July 8, 2008, status conference, Commey was authorized
to employ a psychiatrist to evaluate his fitness for conditional
release.  Commey hired Dr. Barry Rosenfeld, Ph.D., who visited
him at Devens.  Dr. Rosenfeld never submitted a report.

On December 22, 2008, Commey again requested a hearing on
his motion for discharge.  The government, relying on the 2009
Report, opposed the hearing.  Nevertheless, a hearing was
scheduled for September 14, 2009.  In preparation for the
hearing, Commey sought the appointment of Dr. Becotte, the
author of the 2005 Report recommending Commey's release, who,
likewise, never submitted a report in his capacity as Commey's
expert although he testified on Commey's behalf at the hearing.

**b. Hearing and Post-Hearing Submissions**

The hearing on Commey's motion was held over two days:
September 14, and November 9, 2009.  Commey represented himself,
with standby counsel present, and questioned Dr. Channell, who
testified for the government, and Dr. Becotte, who testified on

his behalf.  Their testimony is laid out in more detail below, but, in brief, Dr. Channell gave his opinion that Commey is unfit for release because he still presents a danger, and Dr. Becotte argued that Commey's delusional disorder has remitted and that he is no longer dangerous.

At the conclusion of the hearing the parties were asked to address, in their briefs, "what kind of condition could be imposed" that would mitigate any risk Commey might present. Hr'g Tr. 271:23-25.  In particular, Commey was asked to discuss the possibility of conditional release subject to electronic monitoring.  In a letter filed after his briefs, Commey, through counsel, requested, in descending order of preference, (1) unconditional release, (2) release with conditions consisting "solely of 'a prescribed regimen of medical, psychiatric or psychological care or treatment,'" Letter from Richard Levitt to the Court at 1 (May 21, 2010), ECF No. 175 (quoting 18 U.S.C. § 4243(f)(2)(B)), or (3) release with "ancillary" conditions, including electronic monitoring and living with his mother in Milwaukee, Wisconsin.

**Discussion**

**(1)**

**Motion for Release**

**a. Burden of Proof**

Commey moves for release from civil commitment, arguing
that he has recovered from his delusional disorder and is no
longer dangerous.  Under 18 U.S.C. 4243(f), if the court that
ordered commitment under subsection (e) finds after a hearing
that:

> [a] person has recovered from his mental
> disease or defect to such an extent that
>
> . . . .
>
> (2) his conditional release under a
> prescribed regimen of medical, psychiatric,
> or psychological care or treatment would no
> longer create a substantial risk of bodily
> injury to another person or serious damage
> to property of another, the court shall—
>
> (A) order that he be conditionally
> discharged under a prescribed regimen of
> medical, psychiatric, or psychological care
> or treatment . . . ; and
>
> (B) order, as an explicit condition of
> release, that he comply with the prescribed
> regimen of medical, psychiatric, or
> psychological care or treatment.

18 U.S.C. § 4243(f).  Section 4243(f) also provides for
unconditional release if "his release would no longer create a
substantial risk of bodily injury to another person or serious
damage to property of another."  The person seeking either

9

conditional or unconditional release "has the burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect."  § 4243(d), (f).

**b. Hearing Testimony**

    **i. Dr. Channell's Testimony**

As indicated, Dr. Channell testified for the government at the hearing held on September 14 and continued on November 9. Dr. Channell strongly believed that Commey continues to suffer from delusional disorder – and possibly paranoid schizophrenia – and still presents a serious risk to others.  Although Dr. Channell could not be sure whether Commey still suffers from delusions, the record and observations made by Devens staff strongly supported his suspicion that Commey still has delusional disorder.

In preparation for the hearing, Dr. Channell reviewed Commey's file, including the records he prepared for the Panels on which he sat and other psychology notes.  Dr. Channell's opinion – based on his review of the file as well as his interviews with Commey's treatment team and with Commey himself – was that Commey suffers from "a psychotic disorder that is chronic and pervasive in nature."  Id. at 22:1-2.  Dr. Channell

testified that "some question" remained as to whether that psychotic disorder is delusional disorder or paranoid schizophrenia.  Id. at 20:15-16, 21:24-25.  He defined delusional disorder as a condition marked by non-bizarre delusions, i.e., "fixed beliefs about information that is incorrect and . . . held with [unshakeable] conviction . . . regardless of any information provided to the contrary," id. at 20-21, and paranoid schizophrenia as "a more pervasive disorder that's characterized by delusions which might be bizarre, as well as auditory and visual hallucinations," id. at 21:11-13. Dr. Channell noted that Commey has been diagnosed with both disorders at times throughout the nine years preceding the hearing.  Id. at 21:15-16.

Dr. Channell then turned to the six Panel Reports authored from December 2004 to January 2009.  Dr. Channell's opinion is shared by the all of the Panels except one.  Dr. Channell was the chairperson of the three most recent Panels – held in 2007, 2008 and 2009 – and the author of the Panel Reports those Panels generated.  2009 Report at 7; 2008 Report at 7; 2007 Report at 7; see Hr'g Tr. 16.  The reason for convening a Panel, Dr. Channell explained, is to evaluate a patient's mental health and to make a recommendation to a court whether the patient may be discharged, either conditionally or unconditionally, without creating "a substantial risk of bodily injury to another person

11

or serious damage of property of another," 18 U.S.C. § 4243(e).
Cf. Hr'g Tr. 16-17 (explaining that the Panel meets one to two
months before a Report is due to the requesting court and that
the RAP members vote on a recommendation after evaluating the
record and interviewing the patient).

The 2009 Report was consistent with all the other Panel
Reports except the 2005 Report. See id. at 25:4-8. The Panel
that issued the 2009 Report expressed its opinion that Commey
"continue[s] to suffer from a psychotic disorder and that his
release would create a substantial risk of bodily injury to
others or damage to the property . . . of others." Id. at 24-
25. The Panel also recommended that Commey receive anti-
psychotic medication, which, according to Dr. Channell, is the
only effective treatment for delusional disorder or
schizophrenia. Id. at 24-25; see id. at 40:20-22. The Panel
based its diagnosis in part on Commey's fourteen evaluations
since 2000, which, Dr. Channell testified, form a "clear and
well-established history that Mr. Commey does in fact suffer
from a psychotic disorder." Id. at 25:15-20.

This conclusion is bolstered by the testing which Commey
has completed. Although the "vast majority" of the tests Commey
has taken have been deemed invalid, see infra p. 17, a few tests
that were interpretable "clearly indicated that [Commey]
continued to experience psychotic symptoms." Hr'g Tr. 28:20-22.

Dr. Channell cited, as an example, testing done just before the 2005 Report recommending Commey's release was prepared. Id. at 28:22-24. Dr. Channell was probably referring to the Rorschach test discussed below, infra pp. 19-20, and perhaps the Millon Clinical Multiaxial Inventory-III ("MCMI-III") and Thematic Apprehension Test ("TAT"), about which Dr. Channell did not testify. Gov't's Ex. 6 at 4. According to the 2005 Report, the Rorschach and the TAT indicated that Commey "may be at a considerable risk for being flooded by affect and overwhelmed by more emotions than he can tolerate. The emotional overload can interfere with his ability to think rationally before he acts." Id. at 4-5.

At several points throughout his testimony, Dr. Channell indicated that, because of Commey's guardedness, especially where treatment is concerned, it is difficult or impossible to determine what the content of Commey's delusions or whether he still experiences them at all:

> [Commey:] It is your opinion that Mr. Commey[2] suffers from delusions?
>
> [Dr. Channell:] It is my opinion that it's not possible to determine whether or not he suffers from delusions, given the fact that he's guarded and is unwilling to discuss

---

[2] Commey, then as now, appeared pro se with standby counsel at the hearing and cross-examined Dr. Channell. While conducting questioning, Commey mainly referred to himself in the third person.

those issues and is unwilling to participate
in testing to help evaluate those issues. I
believe that he exhibits behaviors
suggestive of ongoing paranoia and
delusional beliefs. The content of the
specific delusions I couldn't testify to.

Q    But haven't you in the past said that
he has delusions about staff members
operating against him?

A    I believe that he has – certainly has
suspiciousness and paranoia about staff
members working against him. I don't know
that I would necessarily characterize them
as a delusion. I'm not sure they meet the
level of a delusion.

Hr'g Tr. at 132.

But even in the face of Commey's denials that he continued

to experience delusions,[3] the Panels were able to conclude that

Commey still suffered from a mental illness which he could not

control.  Id. at 74:2-3.  It was Dr. Channell's opinion that,

although Commey could stop himself from reporting any delusions

he may have to the treatment team, he could not repress other

manifestations "indicative of ongoing delusions and psychotic

symptoms."  Id. at 74:8-9.  These manifestations include

---

[3] Dr. Channell had earlier opined that Commey's defensiveness and
guardedness made it impossible to discern what the content of
Commey's delusions were, rather than whether he experienced them
at all.  Id. at 73-74 ("[B]ecause of your guardedness and
defensiveness and your unwillingness to participate in testing,
I'm not aware of what the specific content of your delusions
are.")  If there is a distinction to be made, however, it would
be irrelevant because the thrust of Dr. Channell's testimony –
that Commey's lack of insight is indicative of the presence of
delusional disorder – is consistent.

"defensiveness, guardedness, suspiciousness, lack of insight, [and] argumentativeness," id. at 74:5-6, as well as "fixed, rigid, persistent ideas, . . . secretiveness, . . . and a fair degree of narcissism,"[4] id. at 26:10-12. Regarding Commey's attempted hijacking, Dr. Channell said that Commey "continues to exhibit a remarkable lack of empathy, a lack of appreciation of the seriousness of his behavior, and continues to believe that others should have perceived his behavior as less dangerous than in fact it was."[5] Id. at 26-27. Lately, Commey's symptoms have emerged in his relationships with Devens staff members. In

---

[4] Dr. Channell explained what "narcissism" means in this context:

> Basically that means that he has a greater understanding of circumstances than others do. His unwillingness to follow the recommendations of individuals who have specialized training and experience in treating mental illness and assessing mental illness, for example, he believes that he knows better . . . . He knows that he doesn't need medication.

> [T]hat he's representing himself here today is indicative of his narcissism that he in fact is better capable of representing himself than a qualified professional. And his narcissism is reflected through his need to argue constantly with anyone who makes a recommendation to him.

Hr'g Tr. 44-45.

[5] Dr. Channell reiterated this latter point when he testified that an inappropriate comment Commey made to a Devens staffer, see infra p. 18, exhibited Commey's "belief that others should somehow be able to determine on their own that he really means them no harm through his behavior." Hr'g Tr. 39:5-7.

particular, Commey believes that Panel members are plotting against him, a notion that Dr. Channell classified as "an ongoing delusional system." Id. at 26:16-22.

According to Dr. Channell, Commey's symptoms ultimately undermine any benefit treatment offers him. In making the distinction that Commey's failure to meaningfully participate in therapy does not mean that he refuses to talk, Dr. Channell explained that, instead, Commey does not recognize that he suffers from a mental illness:

> [Dr. Channell:] [H]e tends to focus on issues other than his own personal beliefs and experiences. He tends to want to discuss issues, such as, his diagnosis or inconsistencies in the medical record as opposed to exploring his own mental health, and his own history of mental health symptoms, as well as his need for treatment typically fails to demonstrate insight in his mental illness.
>
> [Commey:] Okay. You said he tends to focus on issues other than his personal beliefs. Okay. If his personal beliefs are that there are inconsistencies in the record isn't he sharing these with staff members?
>
> A Yes.
>
> Q So he is sharing his personal beliefs with the staff members?
>
> A Some of them, although he tends to perseverate [on] those issues to the exclusion of other information which could be discussed.

Id. at 129-30.  To illustrate Commey's lack of participation,

Dr. Channell read into the record a note from Devens

psychologist Dr. Jeffrey Sonnega dated December 13, 2007:

> During group time, [Commey] has attempted to
> engage this psychologist in philosophical/
> legal discussions about such topics as a
> cure for mental illness, whether a mental
> illness is due to a chemical imbalance or
> environmental influences, and whether, and
> at what point, can a judge discharge someone
> on an unconditional release.  These
> discussions will be curtailed as it is
> beyond the scope of the group, annoying to
> other group members, and a possible defense
> mechanism to avoid discussing his core
> issues.

Gov't Br. Ex. A at 158; see Hr'g Tr. 94-95.

For similar reasons, Commey refuses to participate in

testing.  Dr. Channell testified that the majority of the tests

the treatment team has administered to Commey have been deemed

invalid because Commey "would leave many items blank which he

believed were trick questions that would be misinterpreted and

used against him."  Hr'g Tr. 28:9-14.

Commey's inability to engage in therapy touches on his

refusal to take medication.  According to Dr. Channell, "[t]he

reason [Commey] doesn't take medication is because he's

delusional.  [H]e lacks insight into his mental illness which is

a cardinal part of psychosis."  Id. at 29:8-10.[6]  However, Dr.

---

[6] Two statements Commey made while at Devens illustrate Dr.
Channell's point that Commey's aversion to medication stems from

17

Channell stressed, "[t]herapy is not effective for individuals with a psychotic disorder in the absence of treatment with medication." Hr'g Tr. 40:20-22.

The 2006, 2007 and 2008 Reports were largely similar to the 2009 Report. Like the 2009 Report, the other Panel Reports relied on evidence that Commey's mental illness had not abated, found "that it was impacting his judgment, behavior, and insight," id. at 37:22-23, and recommended that he remain in custody because release would have created a substantial risk of bodily injury or damage to property. Id. at 36-37; see id. at 43-44 (stating that the 2009 Panel's recommendation was consistent with those of the 2004, 2006, 2007 and 2008 Panels and that it rested on the same bases as did those Panels'). The 2006 Report also disclosed that Commey had made an inappropriate comment to a female staff member at Devens in which he expressed his affection for her. Id. at 38:2-5. But, in Dr. Channell's

---

his lack of insight into his illness. See id. at 29-30 (testifying that the two statements caused the Panel some concern). In the first, Commey told the Panel during the 2006 patient interview: "[M]y mind is all I have, my mind is all I have." Gov't Br. Ex. A at 7. In the second, Commey stated in an individual therapy session in 2007: "[W]hat is my identity without the delusions? I cannot fully explore my identity in this place. How can I identify mental stability in a place that makes everyone unstable?" Id. at 15.

opinion,[7] the Panel's recommendation would have been the same regardless of the incident, which merely exhibited Commey's lack of judgment. Id. at 38:10-20. In sum, it was Channell's opinion that Commey continues to suffer from delusional disorder and that his "current [level of] dangerousness is identical to the level of dangerousness [he] represented at the time of [his] commitment because [he has] not participated in treatment since that time." Id. at 71-72.

According to Dr. Channell, the lone dissenting Panel Report – the 2005 Report, authored by Dr. Becotte, who testified on Commey's behalf at the hearing – inappropriately based its recommendation on Commey's self-assessment that he was no longer delusional. See id. at 36:3-8. Dr. Channell named three factors why, in his judgment, such reliance was ill-advised: (1) any good behavior Commey exhibited while at Devens or Butner was irrelevant to his behavior in the community, (2) Commey's mental illness had supposedly spontaneously remitted without treatment and (3) testing conducted in preparation of the 2006 Report, specifically the Rorschach test, "clearly indicated that Mr. Commey was psychotic and was experiencing psychotic symptoms, had extremely poor impulse control, and was unlikely to be able to function effectively for any length of time in any

_____

[7] Dr. Channell was not on the 2006 Panel, but signed the 2006 Report in his capacity as acting chief psychologist in the chief psychologist's absence. Id. at 37:2-14.

setting without treatment."[8]  Id. at 34-36.  Regarding the first

factor, Dr. Channell indicated that, because Commey's symptoms

"are so circumscribed that they fail to be pervasive across a

large area of functioning, it is very easy for [him] to function

quite well in a secure setting."  Id. at 34:19-22.  Dr. Channell

cited Commey's ability to return to work from his foiled

expedition from Argentina to Antarctica in 1998 without raising

any suspicion from others as to his delusional beliefs.  Id. at

34-35.  Dr. Channell, thus, believed that the 2005 Panel

improperly credited Commey's self-assessment that his mental

illness had spontaneously remitted over other indications that

he was still mentally ill.


### ii. Dr. Becotte's Testimony

Dr. Becotte, who authored the 2004 and 2005 Reports,

testified that he disagreed with Dr. Channell in many respects.

Dr. Becotte reviewed all the Panel Reports since the 2005

Report.  Id. at 188:5-10.  Dr. Becotte interviewed Commey

briefly on August 7, 2009, and November 9, 2009, the morning of

his testimony.  Id. at 199:4-13.  Although Dr. Becotte agreed

that Commey had suffered from delusional disorder at some point,

---

[8] Dr. Channell later testified that "there are serious questions
of validity and reliability with regard to [the] Rorschach
[test]."  Id. at 146:1-3.  However, Dr. Channell suggested that
he disagreed with the decision to ignore the results of that
test once it had been ordered.  See id. at 145-46.

he believed that the disorder had remitted but that Commey still displays some character pathology. Id. at 188:17-22. Those at Devens who continue to diagnose Commey with delusional disorder "view[] delusional disorder as [a] brain[-]based biological disorder of psychotic proportions," id. at 188:23-25, and, based on that premise, recommend medication as the only way for Commey's disorder to remit, id. at 189:1-4. Dr. Becotte disagreed with the brain-based approach, describing two schools of thought in the medical field about delusional disorder – one that ascribes the disorder to biological, brain-based factors and one that ascribes it to cognitive thought processing. He likewise disagreed that medication was effective for delusional disorder – testifying that "it is a generally accepted fact [among psychiatrists] that medication is not helpful for delusional disorder."[9] Id. at 189:20-21. Rather, he believed that "the treatment of choice for this disorder would be cognitive therapy." Id. at 190:11-12.

Dr. Becotte suggested that the symptoms that Dr. Channell described – such as defensiveness, suspiciousness and narcissism – were part of Commey's character and would always be present to some degree, but that they do not, at this time, make him dangerous:

---

[9] Dr. Becotte is not a psychiatrist and was not designated as an expert in psychiatry at the hearing.

If you look at it as a spectrum, maybe on
one end you would have a suspicious
narcissistic paranoid person.  These are
characterological problems lifelong which he
has probably developed through his difficult
childhood that he had.  On the other side of
the spectrum, these characterological
patterns become ingrained and he becomes
driven.  It could get to a psychotic
proportion where he would start to
misinterpret reality and develop delusions.
So I see it is as on a spectrum. He was at
that point – at one point in his life in
2000, '99, '98 where these beliefs drove him
to get involved in that behavior.  Since
that time I believe it has remitted and what
you have left is this gentleman standing
here which is a somewhat suspicious,
somewhat [narcissistic], egotistical
individual with character flaws, but I try
to keep my eye on the target which is[:] are
these character flaws of critical mass that
he would be a danger to himself and
others[?]  [A]nd I will say no.

Id. at 190-91.  Dr. Becotte interpreted the incident with the

female staff member similarly, testifying that the incident was

a mistake and that Commey "misread" the situation but that it

did not suggest that Commey was delusional or dangerous.  Id. at

192:11-18.

Dr. Becotte's recent evaluation confirmed his view.  During

the August 7 interview, Dr. Becotte used the Violence Risk

Appraisal Guide ("VRAG"), an actuarial instrument, to gauge the

risk Commey would pose were he released.  Id. at 194:3-6.

According to Dr. Becotte, Commey scored in the low to moderate

range on the VRAG.  Id.  Based on his clinical interviews with

Commey, his review of the records and "actuarial . . . or
structured professional judgment instruments" – such as the VRAG
– Dr. Becotte found Commey to be "a low to moderate risk of
dangerousness." Id. at 193:12-22.

According to Dr. Becotte, rapid decompensation (or onset of
symptoms) would probably not occur in Commey's case. Id. at
197:3-10. Nevertheless, in order to reduce the risk of
dangerousness even further were Commey conditionally released,
Dr. Becotte recommended weekly mental health counseling. Id. at
196:8-15. In a therapy setting, a counselor would be able to
act before Commey had "some kind of dramatic decompensation."
Id. at 197:7-25. Indeed, Dr. Becotte suggested that, had Commey
been in counseling prior to the hijacking, his counselor would
have perceived that "something [was] going on with him" and
would have acted "long before" the incident. Id. at 197:18-25.

On cross-examination, the government asked Dr. Becotte
about his scoring of the VRAG. The VRAG "assigns scores . . .
based upon [a subject's] historical characteristics" – such as
elementary school maladjustment, history of alcohol problems,
criminal history and failure on prior conditional release –
which predict the probability of violent recidivism. Id. at
219:7-15. See generally Gov't's Ex. 10. The VRAG also takes
into account the score rendered by the Hare Psychopathy
Checklist, which rates the subject's psychopathic tendencies.

Hr'g Tr. 227:3-12.  See generally Robert D. Hare, The
Psychopathy Checklist—Revised (2d ed. 2003).  The scores are
divided into nine categories, and a higher category correlates
to a higher probability of recidivism, where a subject in
Category Nine has nearly a 100 percent probability of
recidivism.  Hr'g Tr. 212:19-23, 230:15-23; see Gov't's Ex. 11.

    According to Dr. Becotte, Commey's score on the VRAG placed
him in Category Four, corresponding to a thirty-one percent
probability of recidivism within ten years, which, as indicated,
Dr. Becotte considered to be in the low-moderate range of
probability.[10]  Hr'g Tr. 230:7-10, 230:20-23.  Part of this
assessment was based on Dr. Becotte's giving Commey four points
on the Hare Psychopathy Checklist and not scoring him on other
factors of the VRAG.  For instance, Dr. Becotte assigned minus
two points for criminal history even though Commey had been
detained in and deported from Argentina for weapons smuggling.
Id. at 220-21.  And on the Hare Psychopathy Checklist Commey
received no points for, inter alia, glibness/superficial charm,
shallow affect, irresponsibility and callousness/lack of
empathy.  Id. at 212-16.  Dr. Becotte indicated that he did not
factor Commey's Argentina arrest into the VRAG because he did
not view it as a conviction or charge and because it occurred in

---

[10] Much of Dr. Becotte's scoring of the twelve characteristics on
the VRAG was based on what Commey reported.  See Hr'g Tr. 220:6-
8.

another country.  Id. at 222:5, 223:14-19.  Had Dr. Becotte considered Commey's arrest in Argentina and assigned him points on the Hare Psychopathy Checklist for the above-named character traits, Commey's score would have placed him in Category Five, correlating to a forty-eight percent chance of recidivism within ten years.  Id. at 233-34.  Notably, Dr. Becotte would have also placed Commey in Category Four had he administered the VRAG days prior to the hijacking at JFK.  Id. at 229:14-25.

**c. Findings Concerning Mental Disease or Defect**

Commey has not proven that he "has recovered from his mental disease or defect to such an extent" that his release would no longer present a danger.  Indeed, there is sufficient evidence to show that he still suffers from the same mental illness he suffered from in 2000, whether or not to the same degree.

Commey argues that, because he has not reported having any delusions for several years, Devens staff have no basis to form a diagnosis of delusional disorder.  According to Commey, he has been without symptoms for several years, yet "clinical significance has been attributed to basic personality traits and rational reactions to undesirable circumstances."  Mot. for Release 3.  Commey is likely alluding to the Panels' reliance on Commey's suspiciousness of Devens staff, and he suggests that he

has a reasonable basis for his suspicions.  Specifically, Commey

states: "[I was] very open and not at all defensive in [my]

dealings with staff for several years and only after certain

events did [my] presentation toward certain staff members

change."  Id.  He goes on to state that he has "observed things

to cause [him] concern about the motivations of certain

individuals" but did not receive "legitimate explanations" for

"this behavior."  Id. at 4-5.  Commey does not explain which

events, things or behavior he is referring to but does state:

"The acquittee has been described as guarded and evasive during

what have been termed psychological interviews but are conducted

in a manner more akin to police interrogations."  Id. at 3.  He

also cites Dr. Channell's alleged failure to provide all the

records he subpoenaed and Dr. Channell's alleged lies about

supplying the complete record as support for his theory about a

staff conspiracy.  Id. at 5.

     Commey also attempts to shift the burden of proof to the

government.  Cf. id. at 4 ("It has not however been revealed how

it can be determined that [Commey] will represent a danger or

how it would be determined that such an individual will remain

stable and non[-]dangerous on the street."); Reply Br. 4 ("What

the government does not and cannot even begin to attempt to

provide is one shred of evidence that the acquittee is dangerous

as a result of this phantom delusional disorder they claim he

now suffers from.  The government has no way of countering the clear and conclusive evidence of the acquittee[']s non-dangerousness namely his presentation over the years.").  But the burden, of course, rests with Commey, and he has not met it on the question of recovery.[11]

Dr. Channell's hearing testimony, supported by all of the Panel Reports except the 2005 Report, establishes that Commey has likely not recovered from delusional disorder even though he stopped reporting occurrences of delusions to Devens staff some time ago.  Commey has undergone fourteen evaluations since 2000, which, as Dr. Channell indicated, form a "clear and well-established history that Mr. Commey does in fact suffer from a psychotic disorder."  Id. at 25:15-20.  Commey's conduct while at Devens – e.g., his suspiciousness, lack of insight, argumentativeness, perseveration, secretiveness and narcissism – form a large part of the basis of this conclusion, as does his current delusion about a staff conspiracy at Devens.

Commey makes much of the problem of diagnosis in the absence of reported symptoms.  He apparently believes, erroneously, that as long as he does not report any new delusions, the diagnosis will no longer be valid.  But one of

---

[11] Under the plain language of 18 U.S.C. § 4243(f), a patient need not show that he has recovered fully from a mental disease or defect, just that he has recovered "to such an extent that" his conditional release would no longer create a substantial risk to the community.

the reasons a conclusive diagnosis based on present conditions cannot be made is Commey's aversion to participating in any program related to treatment, including therapy, testing and medication. Indeed, his justifications for refusing to participate in these programs – a Devens staff conspiracy, for example – only serve to support the diagnosis.

On the same record, but with less personal contact with Commey than Dr. Channell had, Dr. Becotte concluded that Commey's delusions had spontaneously remitted. Dr. Becotte explained that the conduct which Dr. Channell cited as symptomatic of an ongoing delusional disorder were attributable to character flaws and would not be improved with medication. But even without resolving the question of whether therapy is effective without medication – on which Dr. Channell and Dr. Becotte differ – it is difficult to believe, based on the record, that Commey's delusions have remitted spontaneously without treatment. Indeed, Dr. Becotte himself indicated cognitive therapy as "the treatment of choice" for delusional disorder. Hr'g Tr. 190:11-12. Commey not only refuses medication – a reluctance many rational people may share – but any treatment whatsoever. Instead, Commey insists that he no longer suffers from delusions, that there is a conspiracy between members of the treatment team and the Panel and that the tests he is administered contain trick questions designed to

provide support for his continued confinement.  In light of

Commey's consistent and unreasonable hostility to treatment, Dr.

Becotte's opinion that Commey's mental illness has spontaneously

remitted – based on just over two hours of contact with Commey

in the last five years – is not persuasive.


## d. Conclusions Regarding Dangerousness

For many of the same reasons,[12] Commey has not proven that

he no longer presents "a substantial risk of bodily injury to

another person or serious damage to property of another."

According to Dr. Channell, Commey's current level of

dangerousness is identical to that at the time of his

commitment.  Commey has not gained any insight into his illness

and refuses treatment of any kind.  This is especially troubling

with regard to the attempted hijacking, about which Commey

"continues to exhibit a remarkable lack of empathy, a lack of

appreciation of the seriousness of his behavior, and [a

continued belief] that others should have perceived his behavior

as less dangerous than in fact it was."  Hr'g Tr. 26-27.

Although Dr. Becotte testified that Commey's delusions had

remitted some time ago, he conceded that, had he administered

---

[12] Admittedly, the issue of Commey's potential dangerousness is
inclusive of the issue of his recovery since he is required to
prove only that he has recovered to the point that he no longer
presents a risk.

the VRAG to Commey two days before the attempted hijacking in 2000, Commey would have received exactly the same score he did in 2009.  See supra p. 25.  And, as discussed above, see supra pp. 24-25, Dr. Becotte's scoring of the VRAG in 2009 could easily have been higher, placing the probability of violent recidivism at forty-eight percent within the next ten years.

Attempts at mitigating the danger Commey's release would pose are similarly belied by Commey's reluctance to undergo treatment.  Dr. Becotte recommended weekly mental health counseling upon Commey's release.  An experienced mental health counselor would be able to note if Commey had "some kind of dramatic decompensation."  Id. at 197:7-25.  However, Commey continues to debate whether he is mentally ill and refuses the same kind of counseling Dr. Becotte recommended.  Commey has given no indication that he would be more willing to participate in treatment or care on conditional release than he has been while at Devens.  Even when the Court offered Commey conditional release with electronic monitoring, he persisted in seeking unconditional release or conditional release only with medical, psychiatric or psychological treatment.  Although not refusing the Court's offer outright, Commey only embraced electronic monitoring as a third option.  In sum, Commey presents the same or close to the same risk he did when he was placed at Devens, he refuses treatment and he continues to insist that his

delusional disorder has spontaneously remitted while professing

a belief about a staff conspiracy at Devens.

## (2)

### Remaining Motions

#### a. Motion to Vacate

Commey next moves to vacate the order of commitment because

of unnecessary delay.  He points out that he filed his initial

motion for a hearing under 18 U.S.C. § 4247(h) on August 25,

2006, but did not receive a hearing until September 14, 2009.

Commey urges the application of, variously, pre-indictment delay

standards, the Speedy Trial standard and the parole revocation

standard.  The government argues that § 4243 "provides no time

period within which a [c]ourt must conduct a hearing after

receiving an application . . . for a hearing pursuant to 18

U.S.C. § 4247(h)."

The three standards Commey proposes are inapplicable to

Commey's motion.  The government is correct that § 4243 provides

no time period within which a hearing must be conducted.

Moreover, Commey based his 2006 motion on the 2005 Report, which

recommended his release, but did not file the motion until after

the 2006 Report – recommending his continued commitment – was

issued.  See Levitt Affirmation 1-2, Aug. 25, 2006, ECF No. 128;

Gov't's Ex. 5.  In the interim between the 2006 motion and the

hearing in 2009, three more Panel Reports were issued, all of them disagreeing with the 2005 Report's conclusion. Therefore, Commey cannot demonstrate that he was prejudiced by any delay since he did not file his motion for a hearing until after the 2006 Report.


**b. Motion to Exclude Expert Testimony and Evidence and to Find Witness in Contempt**

Commey's final motion concerns the evidence the government presented at the hearing. In this motion, Commey first seeks to exclude Dr. Channell's testimony and the 2006 through 2009 Panel Reports, which were admitted into evidence as Government's Exhibits 2 through 5, because they fail to meet the reliability requirements of Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Additionally, Commey argues that Dr. Channell's testimony should be excluded because he testified inconsistently and made materially false statements. Second, Commey asks that Dr. Channell be found in contempt for giving "materially false testimony that was specifically calculated to impede and obstruct the court in the determination of the issue before it," and for "intentionally and willfully fail[ing] to comply with the subpoena to produce certain records." Mot. to Exclude

Expert Testimony and Evidence and Find Witness in Contempt
("Mot. to Exclude") 11.

As an initial matter, Exhibits 3 through 5 – the 2006, 2007 and 2008 Reports – were admitted as historical records and are, thus, not subject to analysis under Daubert or Rule 702.  Hr'g Tr. 24:11-16.  Next, the Federal Rules of Evidence do not apply in hearings such as Commey's.  See Fed. R. Evid. 1101(d)(3) ("The rules (other than with respect to privileges) do not apply in . . . [p]roceedings for extradition or rendition; preliminary examinations in criminal cases; sentencing, or granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings with respect to release on bail or otherwise.").  Therefore, Commey's argument regarding Rule 702 is unavailing, as is his argument regarding Daubert since the Daubert rule is an interpretation of Rule 702. See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002).

But even under Daubert, Dr. Channell's testimony was reliable.  According to Daubert, Rule 702 requires trial judges to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Daubert, 509 U.S. at 597.  The reliability inquiry is "a flexible one," id. at 594, and focuses "solely on principles and methodology," id. at 595.

Dr. Channell holds a doctorate degree in psychology and is board certified in forensic psychology.  He has been on staff as a psychologist for the Bureau of Prisons since 1999.  He testified at length about the reasoning behind his and the Panel's conclusions, citing instances from the record and from his own experience with Commey, whom he has known since 2006.  Thus, Dr. Channell's testimony "both rests on a reliable foundation and is relevant to the task at hand."  This is equally true of the 2009 Report, which Dr. Channell authored and which set forth the basis for the Panel's recommendation at length.

Commey makes much of Dr. Channell's apparent inconsistency concerning his awareness of Commey's delusions.  See Mot. to Exclude 6.  At one point in the hearing, Dr. Channell stated that he was not aware of the specific content of Commey's delusions, but, at another point, he testified that it was impossible to know whether Commey suffered from delusions because he refuses to participate in treatment.  See supra note 3.  Commey suggests that Dr. Channell's uncertainty indicates that he had no basis to testify about Commey's mental illness. Commey distorts Dr. Channell's testimony, the main thrust of which was that Commey probably still suffers from delusional disorder based on his outward symptoms, but that it is impossible to determine whether he still experiences delusions –

or, if he does, what the content of those delusions are – since Commey refuses to participate in treatment.  On this point, Dr. Channell was consistent.

Commey's other arguments for excluding Dr. Channell's testimony and for finding him in contempt are without basis.  As Dr. Channell testified at the hearing, he was not in control of Commey's medical records, and he produced all the records on which he relied and which were in his control.  None of Dr. Channell's other testimony was false, and certainly none of it was "patently unreliable."


### Conclusion

Commey's motions (1) to exclude Dr. Channell's testimony and Government's Exhibits 2 through 5, (2) to find Dr. Channell in contempt and (3) to vacate the order of commitment are denied.  Commey's motion for release is denied with leave to reopen should a future Panel recommend Commey's discharge.

Dated:    Brooklyn, New York
          September 7, 2010

                              SO ORDERED:


                              _____s/_____
                              David G. Trager
                              United States District Judge